# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

# BLUEFIELD DIVISION

KRISTY RYE,

    Plaintiff,

v.                                        CIVIL ACTION NO. 1:20-cv-00232

ANDREW SAUL,
Commissioner of Social Security,

    Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Kristy Rye ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on April 9, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 5.) Presently pending before this Court are Claimant's Motion for Judgment on the Pleadings and supporting memorandum (ECF Nos. 16, 17) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 20).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 16), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 20), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I. BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 40 years old at the time of her alleged disability onset date and 44 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 43.)[1] She completed the ninth grade. (*Id.* at 186.) Most recently, she worked as a housekeeper at a healthcare center, and she has also been employed as a flagger for the state Division of Highways and as a stocker and janitor at a retail store. (*Id.*) Claimant alleges that she became disabled on October 15, 2015, due to "Learning problems," panic attacks, "Nerves," anxiety, "Nerves in right arm," depression, and stomach ulcers. (*Id.* at 185, 192.)

Claimant protectively filed her application for benefits on February 15, 2017. (*Id.* at 13, 171–76.) Her claim was initially denied on April 20, 2017, and again upon reconsideration on June 12, 2017. (*Id.* at 84–88, 96–102.) Thereafter, on June 26, 2017, Claimant filed a written request for hearing. (*Id.* at 103–06.) An administrative hearing was held before an ALJ on January 15, 2019, in Bluefield, West Virginia, with the ALJ appearing from Charleston, West Virginia. (*Id.* at 31–58.) On March 8, 2019, the ALJ rendered an unfavorable decision. (*Id.* at 10–30.) Claimant then sought review of the ALJ's decision by the Appeals Council on April 4, 2019. (*Id.* at 168–70.) The Appeals Council denied Claimant's request for review on February 6, 2020, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–6.)

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 15.

Claimant timely brought the present action on April 6, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 14) and a transcript of the administrative proceedings (ECF No. 15). Claimant subsequently filed her Motion for Judgment on the Pleadings and supporting memorandum (ECF Nos. 16, 17), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 20). As such, this matter is fully briefed and ready for resolution.

B. Relevant Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

1. *Treatment for Carpal Tunnel Syndrome*

On February 15, 2017, the date she filed her application for SSI benefits, Claimant presented to her primary care provider and reported "having issues with right arm pain with numbness" from her elbow to her middle and ring fingers. (Tr. at 325.) She stated that she "has tried [a] brace for carpal tunnel" with "no improvement." (*Id*.) Her provider referred her to a neurologist for a nerve conduction study of her right upper extremity. (*Id*. at 327.)

Several weeks later, on March 3, 2017, Claimant presented to the neurologist and reported "intermittent numbness and tingling in her hands for more than a year, especially the right hand." (*Id*. at 422.) She told the neurologist that her symptoms had worsened after a four-wheeler accident "About four months ago" during which "she hit a tree root and jerked her right thumb." (*Id*.) Claimant described her symptoms as "a 'funny-bone' kind of feeling across her right elbow, and it runs down to her forearm, to

3

her thumb, middle and ring finger." (*Id.*) She denied shoulder, neck, and back pain and numbness and tingling in her legs and feet. (*Id.*) Upon physical examination, the neurologist observed "Normal muscle bulk and tone" and full muscle strength in Claimant's extremities, and he noted a "tingling feeling to touch, in right middle and ring fingers, and thumb, but no difference [to sensory examination] compared to left hand fingers." (*Id.* at 423.) He ordered an EMG and a nerve conduction study of Claimant's upper extremities and bloodwork to rule out carpal tunnel syndrome, ulnar neuropathy, and radiculopathy. (*Id.* at 424.) The EMG and nerve conduction study were conducted on March 7, 2017, and revealed "neurophysiologic evidence of moderately severe bilateral carpal tunnel syndrome, right side worse than left side" but "no neurophysiologic evidence of ulnar neuropathy or cervical radiculopathy bilaterally." (*Id.* at 425.)

Claimant returned to her neurologist on March 31, 2017, and continued to report intermittent numbness in her hands and right forearm, without any neck pain. (*Id.* at 426.) The neurologist diagnosed her with moderately severe bilateral carpal tunnel syndrome, worse on the right side than the left, and right upper extremity pain without evidence of cervical radiculopathy. (*Id.* at 428.) He recommended surgery, and Claimant told him that she was willing to have the procedure, so he referred her for a bilateral carpal tunnel release evaluation. (*Id.*) He also stated that if the surgery did not resolve Claimant's right upper extremity pain, he would order an MRI of her cervical spine. (*Id.*) The medical evidence of record does not include any treatment notes indicating that the carpal tunnel release surgery was ever performed or that Claimant again presented to her neurologist or any other provider for further treatment of her carpal tunnel syndrome.

*2. Consultative Medical Examination: Dr. Joan Crennan, M.D.*

On September 27, 2016, several months prior to her alleged onset date of February 15, 2017, Claimant presented to occupational medicine specialist Dr. Joan Crennan, M.D. ("Dr. Crennan") for a consultative medical examination in connection with a prior SSI claim. (*Id.* at 315–18.) She did not report any right upper extremity symptoms to Dr. Crennan. (*Id.* at 315–16.)

Upon physical examination of Claimant's upper extremities, Dr. Crennan observed that Claimant's "shoulders, elbows and wrists are nontender" and without "redness, warmth, swelling, or nodules." (*Id.* at 317.) Her forward shoulder flexion was to 180 degrees bilaterally, her abduction was to 180 degrees bilaterally, her internal shoulder rotation was to 90 degrees bilaterally, and her external shoulder rotation was to 90 degrees bilaterally. (*Id.*) Her elbow flexion was "to 150 degrees with extension to 0 degrees bilaterally." (*Id.*) Her wrist extension was 0 to 60 degrees bilaterally, and her wrist flexion was 0 to 70 degrees bilaterally. (*Id.*) Dr. Crennan observed no tender points in Claimant's forearms. (*Id.*)

Upon physical examination of Claimant's hands, Dr. Crennan observed no tenderness, redness, warmth, swelling, or atrophy. (*Id.*) Claimant was able to make a fist bilaterally, write with her dominant hand, and pick up coins with either hand without difficulty. (*Id.*) She had full grip strength and normal range of motion in her finger joints of both hands. (*Id.*) Dr. Crennan noted no Heberden or Bouchard's nodes. (*Id.*)

A neurological examination revealed full muscle strength in Claimant's upper extremities, well-preserved sensory modalities, and normal deep tendon reflexes. (*Id.*) A Hoffmann sign was negative. (*Id.*)

### 3. *Hearing Testimony Related to Carpal Tunnel Syndrome*

During the hearing, the ALJ enlisted a medical expert to testify about Claimant's physical impairments, and without the benefit of the treatment notes from Claimant's neurologist, she testified "that it's highly likely . . . that [Claimant] does have carpal tunnel syndrome on the right, documented since February of [2017]." (*Id.* at 37.) The medical expert opined that Claimant "is going to have some limitations in her right upper extremity, which is her dominant side," elaborating "that fingering, feeling, and handling on the right are going to be limited to occasional based on the clinical picture of her carpal tunnel syndrome." (*Id.* at 38.) She further explained that Claimant would have no reaching limitation because "typically, with carpal tunnel, the problems are mostly with repetitive motions of the hands and wrists." (*Id.* at 39.)

Claimant, upon questioning from her counsel, testified that she had been diagnosed with carpal tunnel syndrome and experienced difficulty using her right hand. (*Id.* at 46–47.) She remarked, "If I try to draw or anything, it goes numb, and I can't feel it." (*Id.* at 47.) She also testified that she had trouble holding onto things and "doing finer things" like buttoning a button or picking up coins. (*Id.*) In addition, she stated, "I can't even lift a gallon of milk without my elbow hurting." (*Id.*) Upon questioning from the ALJ, Claimant testified that her neurologist diagnosed her with carpal tunnel syndrome "About three years ago" and that he recommended surgery, but she "got scared" and never had the procedure. (*Id.* at 55.) She told the ALJ that she wore a glove while sleeping because "It's worse when I wake up." (*Id.* at 56.) The ALJ asked Claimant if her inability to write had "something to do with [her] hand," and Claimant replied, "Well, that, too, but I just don't know how to spell the words." (*Id.*)

6

The ALJ also heard testimony from a vocational expert ("VE"), to whom he presented several hypothetical scenarios. In the first hypothetical, the individual, like Claimant, was right-hand dominant, and she was limited to occasional use of hand controls with the right hand and frequent handling, fingering, and feeling with the right hand. (*Id.* at 49.) The VE testified that the hypothetical individual would be capable of performing Claimant's past work as a janitor and that other work as a price marker, sorter, and counter attendant would be available nationally. (*Id.* at 50.) In another hypothetical, the ALJ limited the individual to only occasional handling, fingering, and feeling with the right hand, and the VE testified that she could not perform Claimant's past work and that only one job, that of a bakery helper, would be available nationally. (*Id.* at 51.)

The ALJ then asked the VE about an individual who could handle frequently but finger and feel occasionally, and the VE testified that the hypothetical individual could work as a sorter, a bakery helper, or a counter attendant. (*Id.* at 52.) She also testified that a hypothetical individual who could occasionally handle but finger frequently could work as a bakery helper. (*Id.* at 52–53.) The ALJ next asked the VE if work would be available for an individual limited to sedentary work who could handle occasionally but finger frequently, and she answered in the negative. (*Id.* at 53.) The ALJ's last hypothetical individual was limited to sedentary work and could handle frequently but finger occasionally, and the VE again testified that the individual could not perform Claimant's past work and that no work would be available nationally. (*Id.*)

Claimant's counsel questioned the VE about some of the representative occupations she mentioned during her testimony, first asking her why an individual limited to occasional handling, fingering, and feeling could work as a bakery helper. (*Id.* at 54.) The VE explained that a bakery helper "looks[] at bakery products" to "see if it

7

meets the standard," and "there's only occasional use of the upper extremities." (*Id.*) Claimant's counsel also asked the VE what a counter attendant does, and the VE explained, "It's taking food from the kitchen to a counter, like at one of the places where you get buffet food." (*Id.*) Lastly, Claimant's counsel asked about the sorter position, and the VE testified, "It's not manipulative in the sense that you use your fingers," and affirmed that a sorter "mov[es] something from one place to another." (*Id.* at 54–55.)

C. *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.\* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

8

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es]

9

his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20

C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a [VE] responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (Tr. at 16.) He found that Claimant's affective disorder, anxiety disorder, borderline intellectual functioning, and bilateral carpal tunnel syndrome, more significant on the right, constituted "severe" impairments. (*Id.*) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 16–19.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently," "can sit or stand and/or walk for up to six hours each in an eight-hour workday," "can occasionally operate hand controls with the right dominant hand, and can occasionally handle, finger, and feel with

the right dominant hand." (*Id.* at 19.) He found that she "can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds" and "can occasionally kneel, crouch, and crawl," but "She can never work at unprotected heights or around moving mechanical parts, and can never operate a motor vehicle." (*Id.*) The ALJ further found that Claimant "should never be expected to work in dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, or vibration," but "She can tolerate a moderate level of noise." (*Id.*) In addition, he determined that she "can perform simple, routine, and repetitive tasks, but not at a production rate pace (e.g. assembly line work)" and "is limited to no more than simple work-related decisions"; that she "can tolerate frequent interaction with supervisors, but only occasional contact with coworkers and the public," and "She cannot engage in direct customer service with the public"; and that she "would be off task for 15 percent of an eight-hour workday" in addition to normal breaks. (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was unable to perform her past relevant work. (*Id.* at 21.) He noted that Claimant is "a younger individual" with "a limited education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.*) Because the ALJ determined that Claimant was unable to perform the full range of light work, he enlisted a VE to aid in his finding that Claimant is capable of working as a bakery helper, although he ultimately concluded that "there are no jobs that exist in significant numbers in the national economy that [Claimant] can perform." (*Id.* at 21–22.)

However, the ALJ then applied SSR 18-3p in light of the evidence that Claimant's neurologist had recommended carpal tunnel release surgery, but "she was too fearful to undergo the procedure." (*Id.* at 22.) The ALJ remarked that Claimant failed to show good cause for failing to comply with her prescribed treatment, which he found would modify

12

her RFC by giving her the ability to frequently, rather than occasionally, "handle, finger, and feel with the right dominant hand." (*Id.* at 22–23.) He determined, "If [Claimant] followed prescribed treatment, she would be able to perform her past work as a janitor . . . as generally performed." (*Id.* at 23–24.) He further found that she would be able to work as a price marker, sorter, or counter attendant. (*Id.* at 24.) As a result, the ALJ concluded that Claimant was not "under a disability . . . since February 15, 2017, the date the [SSI] application was filed." (*Id.* at 25.)

## II. LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III. ANALYSIS

Claimant argues that the ALJ inadequately explained his reasons for concluding that carpal tunnel release surgery would allow her to frequently, rather than occasionally, handle, finger, and feel with her right hand, thereby rendering her able to perform her past work as a janitor, in addition to other work in sufficient numbers in the national economy, and therefore not disabled. (ECF No. 16 at 6–10.) She asks this Court to reverse the Commissioner's decision and award her benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 10.) The Commissioner responds that the objective findings of the consultative examiner and Claimant's treating neurologist and Claimant's daily activities support the ALJ's determination that carpal tunnel release surgery would restore her functioning because that same evidence indicated that her ability to handle, finger, and feel with her right hand was never as deficient as the ALJ found it to be. (ECF No. 20 at 12–14.) The Commissioner further contends that the ALJ need only determine that the prescribed treatment "'would be expected' to result in improved function, not that it must result in improved function" and that he properly found no good cause for Claimant's failure to undergo the carpal tunnel release surgery. (*Id.* at 14–18.)

Claimant's argument stems from the ALJ's application of SSR 18-3p, 2018 WL 4945641 (Oct. 2, 2018), to her case. (ECF No. 16 at 6.) "In order to get benefits, [a claimant] must follow treatment prescribed by [her] medical source(s) if this treatment is expected to restore [her] ability to work." 20 C.F.R. § 416.930(a). If she chooses not to do so "without a good reason," she will be found not disabled. *Id.* § 416.930(b). SSR 18-3p "explains the policy and procedures [the Social Security Administration] follow[s] when [it] decide[s] whether an individual has failed to follow prescribed treatment." 2018

14

WL 4945641, at *2. It governs the situation in which a claimant is found to be disabled, but there is evidence in the record that she was prescribed treatment for her disabling impairment(s) and did not comply with that treatment. *Id.* at *2–*3. Claimant does not assert that these three prerequisites are not met or that the ALJ should not have considered SSR 18-3p in this case at all. (ECF No. 16 at 6–10.)

To apply SSR 18-3p, the ALJ "[a]ssess[es] whether the prescribed treatment, if followed, would be expected to restore the individual's ability to [work]" and "whether the individual has good cause for not following the prescribed treatment." 2018 WL 4945641, at *4. Here, the ALJ first found that Claimant did not demonstrate good cause for failing to undergo the carpal tunnel release surgery because she did not provide the required written statement from her neurologist stating that her "intense fear of surgery is, in fact, a contraindication to having the surgery," nor did she supply evidence that she "was advised against the procedure by another physician" or that she had "undergone an unsuccessful carpal tunnel release or related surgery in the past." (Tr. at 22.) He also noted that Claimant had undergone or had agreed to undergo other surgical procedures. (*Id.*) Claimant does not challenge the ALJ's determination that she did not establish good cause. (ECF No. 16 at 6–10.)

The ALJ also found that the carpal tunnel release surgery would be expected to restore Claimant's ability to work because "the symptoms of carpal tunnel generally resolve following release surgery" and "The fact that [Claimant's neurologist] recommended the procedure indicates that he clearly believed it was likely to result in improved functioning." (Tr. at 22.) Claimant contends that "neither of these conclusory statements find support in the record and are nothing more than assumptions on the part of the ALJ." (ECF No. 16 at 7.) She asserts that the ALJ should have consulted her

15

neurologist about her prognosis or, at the very least, asked the medical expert during the hearing how carpal tunnel release surgery might affect her symptoms. (*Id.* at 9.) However, "evidence that . . . [t]he treatment is generally known to be sufficiently effective for the individual's impairment" may be adequate to "show that the prescribed treatment, if followed, would sufficiently improve the impairment[]." Soc. Sec. Admin., Program Operations Manual System (POMS), DI 23010.011B.3 How to Make a Failure to Follow Prescribed Treatment (FTFPT) Determination (Jan. 3, 2019), https://secure.ssa.gov/apps10/poms.nsf/lnx/0423010011.[2] The ALJ was thus entitled to rely on the general effectiveness of carpal tunnel release surgery to determine that it could be expected to relieve Claimant's symptoms to the point that she could frequently handle, finger, and feel with her right dominant hand.

Further, the ALJ's inference that Claimant's neurologist would not recommend a surgical procedure if he surmised that it would provide no benefit is a reasonable one. To the extent the neurologist's alternative plan in the event that the carpal tunnel release surgery were unsuccessful (*see* Tr. at 428) suggests a negative prognosis, "the prescribing medical source's prognosis" is simply one factor for the ALJ to consider in making the administrative determination of whether the claimant's prescribed treatment, if followed, can be expected to improve her functioning such that she is able to work. SSR 18-3p, 2018 WL 4945641, at *4. In other words, the treating provider's prognosis is not decisive. And the ALJ is not required to contact the individual or her provider or to utilize a consultative examiner or a medical expert to make the determination, *id.* at *6, even though doing so would provide additional support for the ALJ's conclusion. As such, the undersigned

---

[2] POMS is an internal agency document with no legal force on this Court, but its tenets bind the ALJ. *Collier v. Colvin*, No. 3:16-cv-59 (MHL), 2016 WL 8603654, at *7 (E.D. Va. Dec. 19, 2016) (quoting SSR 13-2p, 2013 WL 621536, at *15 (Feb. 20, 2013)), *adopted by* 2017 WL 1100435 (E.D. Va. Mar. 21, 2017).

16

**FINDS** that the ALJ's stated reasons for deciding that carpal tunnel release surgery could be expected to restore her ability to work are adequate.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 16), **GRANT** the Commissioner's request to affirm his decision (ECF No. 20), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Faber.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

      The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

      ENTER: December 30, 2020

Dwane L. Tinsley
United States Magistrate Judge